In re DOSKOCIL COMPANIES INCORPORATED, et al., Debtors.

Bankruptcy Nos. 90–40414–11 to 90–40432–11.

United States Bankruptcy Court, D. Kansas.

Aug. 15, 1991.

See also 130 B.R. 858.

Dennis Dow of Shook, Hardy and Bacon, Kansas City, Mo., and Lee R. Bogdanoff of Stutman, Treister & Glatt, Los Angeles, Cal., for debtor.

Lisa Tipping Davis of Musser and Bunch, Okl. City, Okl., for Ad Hoc Committee of Salaried Retirees.

## MEMORANDUM OF DECISION

JOHN T. FLANNAGAN, Bankruptcy Judge.

This matter comes before the Court upon the Motion of Wilson Foods Corporation (a) To Determine That Modification Procedures Under Section 1114 of the Bankruptcy Code Do Not Apply to Certain Adjustments of Salaried Retiree Benefits or, (b) in the Alternative, to Appoint Retiree Committee. The Motion is opposed by the Ad Hoc Committee of Salaried Retirees. It is supported by the Official Unsecured Creditors' Committee of Doskocil Companies Incorporated; the Official Unsecured Creditors' Committee of Wilson Foods Corporation; Chemical Bank and the Bank Group; and the United States Trustee. The Court sustains the motion for the reasons set out below.

### Appearances

Debtor appears by Dennis Dow of Shook, Hardy & Bacon and Lee R. Bogdanoff of Stutman, Treister & Glatt; the Official Unsecured Creditors' Committee of Doskocil Companies Incorporated appears by John Lee and Shelly Rothschild of Andrews & Kurth; the Official Unsecured Creditors' Committee of Wilson Foods Corporation appears by Christopher J. Redmond of Redmond, Redmond & Nazar; Chemical Bank, for itself and for the Bank Group, appears by Paul Hoffman of Smith, Gill, Fisher & Butts; the Ad Hoc Committee of Salaried Retirees appears by Lisa Tipping Davis of

Musser & Bunch; and the United States Trustee appears by Joyce Owen.

## Jurisdiction

The Court finds that this motion is a core proceeding under 28 U.S.C. § 157 and that the Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984.

## Issue

Whether the Court must appoint a Retiree Committee under § 1114 of the Bankruptcy Code when the debtor has reserved the power to amend, modify or terminate ERISA welfare plan benefits by unambiguous language in the plan.

## Discussion

Wilson Foods Corporation ("Wilson") is a direct subsidiary of Doskocil Companies Incorporated ("Doskocil") and one of nineteen affiliated corporations of the Doskocil group to file for protection under Chapter 11 of the Bankruptcy Code on March 5, 1990. Wilson filed a motion on December 28, 1990, entitled: "MOTION OF WILSON FOODS CORPORATION (A) TO DETERMINE THAT MODIFICATION PROCEDURES UNDER SECTION 1114 OF THE BANKRUPTCY CODE DO NOT APPLY TO CERTAIN ADJUSTMENTS OF SALARIED RETIREE BENEFITS OR, (B) IN THE ALTERNATIVE, TO APPOINT RETIREE COMMITTEE." A supporting memorandum with the witness declaration of William L. Brady, Vice President and Controller of Wilson Foods Corporation, accompanied the motion. Attached to the declaration were Exhibit A, "Health Care and Life Insurance Coverage for Certain Salaried Retirees of Wilson Foods Corporation (Retirements before July 1, 1989)," and Exhibit B, "Salaried Retiree Medical Plan Comparison."

Wilson also filed a copy of a transmittal letter dated December 28, 1990, that it sent to retirees to explain its position that modification of benefits under the plan would be necessary and forthcoming. This letter is set out in full in the Appendix attached to this Memorandum of Decision.

In response to the Wilson motion, a group known as the "Ad Hoc Committee," consisting of 181 salaried retirees of Wilson (or its predecessor), filed an objection on January 14, 1991, which included a memorandum of authorities. These salaried retirees were participants under a plan entitled, "Health and Life Insurance Coverage for Certain Salaried Employees of Wilson Foods Corporation."

Wilson filed a reply to the Ad Hoc Committee's objection on January 25, 1991. The United States Trustee filed a statement in support of the Wilson motion on January 11, 1991.

The Court heard oral argument on the motion and objection on January 31, 1991, and, after ruling that formation of a Salaried Retiree Committee could await this decision, took the question under advisement.

## Background

Wilson maintains health care and life insurance plans for two principal categories of its retirees—those who were at the time of retirement from Wilson (1) non-union salaried employees, and (2) union hourly employees. The welfare benefits plan covering the latter group is part of a collective bargaining agreement with the United Food and Commercial Workers Union ("UFCW"). Wilson concedes that a committee should be appointed to represent the hourly retirees; accordingly, the Court has appointed a committee under § 1113 and § 1114 to negotiate regarding modification of benefits under the union hourly retirees' plan.

In this Memorandum, our exclusive focus is on the non-union salaried retirees' plan. Wilson contends it has no legal obligation under the plan terms to continue providing these retirees with benefits to the extent the benefits have not yet been incurred.

In accordance with the requirements of Title I of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 ("ERISA"), the terms of the salaried plan are described in a formal written document called a "Summary

Plan Description" ("SPD"). Because they are numerous and lengthy, those provisions of the SPD that refer to the employer's right to amend, modify or terminate the plan are set forth in the attached Appendix with page references to the SPD and emphasis added to show the passages that alert employees to possible changes in benefits.

The Ad Hoc Committee's objection to Wilson's motion concedes that the matter before the Court is a question of law with no genuine issue of material fact. The objection identifies the Committee's membership by attaching an exhibit listing the 181 members' names. All are said to be salaried non-union employees not covered by a collective bargaining agreement at the time of their retirement. No other exhibits are presented and no affidavits are offered. The objection alleges no misrepresentation by Wilson. It does not claim that the SPD is ambiguous in its language about the right to amend, modify or terminate plan benefits. The principal argument in the opposition brief is that Bankruptcy Code § 1114 should be applied and the Ad Hoc Committee appointed as an official committee to negotiate with the debtor about proposed plan changes.

*Wilson Contentions*

Wilson contends that as part of its ongoing effort to design a plan of reorganization, it needs to adjust certain *future* retiree benefits provided for under its plan of "Health Care and Life Insurance Coverage for Certain Salaried Retirees of Wilson Foods Corporation" (this document is the ERISA Summary Plan Description or "SPD"). It further postulates that its plan reserves its right to "amend, modify or terminate" retiree benefits as set forth in the SPD and that it intends to do so, primarily by "tying increases in deductibles and out-of-pocket maximums to cost of living increases and limiting (a) plan benefits to those services approved by Medicare (except for prescription drugs), and (b) benefit payments to the Medicare approved amount." Wilson proposes to make the adjustments effective on the earlier of: (i) the effective date of Doskocil Companies

Incorporated's (and its direct and indirect subsidiaries, including Wilson) reorganization plan, or (ii) June 30, 1991.

Wilson asks the Court to determine that it has no contractual duty under the terms of the benefit plan that would prevent such adjustments and further to determine that Wilson need not comply with the requirements of § 1114 before making such adjustments. In the event the Court should decide that § 1114 is applicable to the adjustments, Wilson asks for the appointment of a committee under that section.

Wilson characterizes the benefits under the salaried plan as "terminable" and "non-terminable," pointing to the following language from page 31 of the SPD, with emphasis added, from its memorandum brief:

COVERAGE TERMINATION/SURVIVING SPOUSE:

. . . .

*Wilson Foods Corporation reserves the right to amend, modify or terminate the plans described in this handbook at any time* subject only to the limitation that no amendment, modification or termination shall serve to limit, reduce or otherwise adversely affect any claim for covered services or supplies *already incurred,* provided you, or your spouse, were entitled to benefits under the plan immediately prior to the date of the amendment, modification or termination.

The non-terminable benefits for a covered person are said to be those arising from a "claim for covered services or supplies already incurred" on the date of the amendment, modification or termination of the plan. Wilson's brief represents that "at any time, these incurred but unreimbursed or unsatisfied benefit claims typically total approximately $400,000 per 60–day period for an annual total of approximately $2.4 million." Wilson concedes that to amend, modify or terminate these claims, it must comply with § 1114 of the Code.

The benefits Wilson characterizes as "terminable" are those claims for covered services or supplies which have not yet been incurred or provided when the proposed amendment, modification or termi-

nation is put into effect. Wilson says the retirees will have no legal right to payment of these benefit claims once it exercises its power to curtail the benefits as allowed by the unambiguous language of the SPD.

### Ad Hoc Committee Contentions

In its objection, the Ad Hoc Committee contends that Wilson's proposed adjustments to the benefit plan clearly fall within the requirements of § 1114, thereby necessitating the appointment of a committee under that section. The Committee seems to say that notwithstanding the plain language of the plan allowing change of future benefits, § 1114 creates an obligation when the debtor comes into Chapter 11 that can only be changed by use of § 1114.

### ERISA

█ Does Wilson have a legal obligation under ERISA to pay future welfare benefits to retirees when the unambiguous language of the SPD allows amendment, modification or termination of the benefits?

There is an abundance of authority to support Wilson's position on this issue. Since *In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986), federal courts in the Second, Eighth, and Eleventh Circuits have addressed the question of welfare benefit plan modifications in various contexts. Absent proof of fraud, the Circuits have ruled unanimously that if the SPD is unambiguous in allowing modification of welfare benefits, the employer will be permitted to make changes.[1]

*White* holds that ERISA preempts application of state "vested upon retirement"

rules and that an employer does not breach a fiduciary duty to plan participants when it exercises its reserved power of termination over benefits. The case further clarifies the difference between pension rights and welfare benefit rights under ERISA:

> There is an express statutory exclusion of welfare plans from the stringent minimum vesting, participation, and funding standards imposed on pension plans, ERISA §§ 201(1), 301(a)(1), 29 U.S.C. §§ 1051(1), 1081(a)(1), and also an exclusion of welfare benefits from the definition of "accrued benefits" in Treasury regulations, 26 C.F.R. § 1.41(a)–7(a)(ii) (1981), promulgated under ERISA § 1053(a), 26 U.S.C. § 411.

*Id.* at page 1191.

Congress' reason for allowing a modification of health and welfare benefits is well stated in *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488 (2d Cir.1988) at page 492:

> With regard to an employer's right to change medical plans, Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate predictions of

---

1. *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488 (2d Cir.1988) (Summary judgment for employer in suit by retirees to prevent change in medical benefits where employer reserved right to amend or terminate plan); *Musto v. American General Corp.,* 861 F.2d 897 (6th Cir.1988) (Injunction favoring plaintiffs who challenged employer's changes in medical insurance in employee class action under ERISA reversed on appeal); *Adams v. Avondale Industries, Inc.,* 905 F.2d 943 (6th Cir.1990) (Summary judgment for employer on employee's ERISA action to recover severance pay upheld on appeal, reversed on other grounds); *Anderson v. Alpha Portland Industries, Inc.,* 836 F.2d 1512 (8th Cir.1988) (Summary judgment against class action retiree

plaintiffs seeking to recover life and health benefits under collective bargaining agreement sustained on appeal); *Howe v. Varity Corp.,* 896 F.2d 1107 (8th Cir.1990) (Injunction to reinstate terminated welfare benefits in ERISA action by representative of retirees reversed on appeal, appeal affirmed in part); *Nachwalter v. Christie,* 805 F.2d 956 (11th Cir.1986) (Declaratory judgment that written ERISA instrument precluded oral modification of plan granted in favor of trustee of employee benefit plan upheld on appeal); *Alday v. Container Corp. of Am.,* 906 F.2d 660, 665 (11th Cir.1990) (Summary judgment against salaried retirees who brought ERISA action challenging employer's decision to modify benefits and premiums upheld on appeal).

future needs and costs. While these plaintiffs would be helped by a decision in their favor, such a ruling would not only fly in the face of ERISA's plain language but would also decrease protection for future employees and retirees.

The 10th Circuit is in accord with the other Circuits on the notion that the written terms of the benefit plan govern. In *Straub v. Western Union Telegraph Co.*, 851 F.2d 1262 (10th Cir.1988), a retiree sued his former employer for pension benefits at a rate stated in the plan of his former employer but not stated in the plan of the company to which he had transferred. The complaint was based on state law theories of breach of contract and negligent misrepresentation. The trial court dismissed plaintiff's claims as preempted by ERISA. On appeal, the Circuit Court affirmed, holding that ERISA preempts state law recovery theories and that no liability exists under ERISA for purported oral modifications of the terms of an employee benefit plan.

In this case, there is no claim by the Ad Hoc Committee that the SPD is ambiguous. The SPD is replete with provisions reserving the power to amend, modify or terminate the plan benefits so long as they are not yet "incurred." Wilson proposes only to modify the future, unincurred benefits. Under the cited decisions, the Court finds Wilson has no legal obligation to continue paying future plan benefits as they are now defined in the SPD.

### The Code Sections

■ Must the Court appoint a committee to negotiate for retirees under § 1114 when the debtor has no legal obligation under ERISA to refrain from amending, modifying or terminating their future welfare plan benefits?

So far as the Court has been able to determine, there are no decisions providing guidance on this question except for *In re Chateaugay Corp.*, 111 B.R. 399 (S.D.N.Y.1990). Although not directly on point, it is helpful.

*Chateaugay* involved multiple parties: (1) three mining subsidiaries of LTV Steel Corporation—BCNR Mining Corporation, Nemacolin Mines Corporation, and Tuscaloosa Energy Corporation (collectively "the Mining Companies"); (2) the parent company, LTV Steel Corporation ("LTV"); (3) the United Mine Workers of America ("UMWA"); and (4) a 1974 Benefit Plan and Trust ("Plan & Trust").

The Plan & Trust was a collectively bargained, multi-employer welfare benefit plan that provided health benefits to certain retirees of the UMWA and their surviving spouses. The Plan & Trust was established under the National Bituminous Coal Wage Agreement of 1974 and had been continued through successive wage agreements, including one known as the 1984 Wage Agreement. Historically, the union represented the employees and retired employees of the Mining Companies in collective bargaining. The 1984 Wage Agreement provided that the Plan & Trust would pay health benefits to those retirees who would not otherwise receive benefits because their last signatory employers were "no longer in business."

The Mining Companies were signatories to the 1984 Wage Agreement which required employers to provide health benefits to their retirees. The Mining Companies complied with this requirement, but ceased operations in 1986. LTV and its subsidiaries then filed a petition under Chapter 11 on July 17, 1986, and unilaterally terminated the health benefits of their retirees.

Congress responded by passing a law on July 30, 1986, requiring reinstatement of the health benefits. (Section 608 of the second title VI of the "Joint resolution making continuing appropriations for the fiscal year 1987, and for other purposes") LTV obtained approval from the bankruptcy court to reinstate the benefits retroactively to July 17, 1986. LTV then continued to pay the benefits until August 1, 1988, even though the 1984 Wage Agreement expired by its terms on January 31, 1988.

Although LTV and the Mining Companies contended they were no longer contractually or legally obligated to provide

retiree benefits, they continued to pay and filed an adversary proceeding against the Plan & Trust and UMWA in two counts. The first count asked for a declaratory judgment deciding that their obligation to pay the benefits terminated with the expiration of the 1984 Wage Agreement on January 31, 1988. The second count sought to hold the Plan & Trust liable for reimbursement of the payments LTV and the Mining Companies had made to retirees since the expiration of the 1984 Wage Agreement on January 31, 1988.

LTV and the Mining Companies moved for summary judgment on count one, as did the UMWA, which filed a crossclaim seeking to hold the Plan & Trust liable for the benefits. On August 1, 1988, Bankruptcy Judge Lifland ruled that the Mining Companies' obligation to pay benefits ended on January 31, 1988, with the expiration of the 1984 Wage Agreement. On August 4, 1988, the judge also ruled that the Plan & Trust was liable for the benefits.

After some procedural steps to insure a final order had been entered, the Plan & Trust appealed to the District Court claiming, *inter alia,* that Judge Lifland's order of August 1, 1988, violated the Retiree Benefits Bankruptcy Protection Act of 1988, and that the Mining Companies did not meet the "no longer in business" definition in the Wage Agreement.

The Mining Companies argued that if the Protection Act applied, it was not intended to compel debtors to make retiree health benefit payments if they were not legally obligated to do so.

The Retiree Benefits Bankruptcy Protection Act of 1988 has three sections. The first section merely states the short title of the Act. Section 2 is the present § 1114 of the Bankruptcy Code, effective June 16, 1988. Section 3 is amended section 608 of the second title VI, the Senate stop-gap legislation previously mentioned. This law applied to Chapter 11 cases pending at the time the Retiree Benefits Bankruptcy Protection Act of 1988 was passed.

Because by its terms Section 2 of the Act did not apply to cases commenced before June 16, 1988, such as *Chateaugay,* the district court held that Section 2 was not applicable.

But, section 3 of the Act did apply. As mentioned, this was an amendment to § 608(a) of the second title VI of the "Joint resolution making continuing appropriations for the fiscal year 1987, and for other purposes," the stop-gap legislation passed by Congress pending passage of the present § 1114. Most of the terms of section 608 were the same as those of § 1114. The Mining Companies conceded that section 608 applied, but argued that it did not obligate them to continue to provide retiree benefits.

After looking at the legislative history of the Retiree Benefits Bankruptcy Protection Act, the court cited a remark by Senator Heinz that "[t]he bill will protect retirees from unilateral termination of benefits by a company filing a Chapter 11 bankruptcy petition." *Id.* at p. 404. The district court then held that since the Mining Companies were no longer legally obligated to pay under the collective bargaining agreement that expired January 31, 1988, section 3 of the Retiree Benefits Bankruptcy Protection Act did not make them liable. Section 3 was intended to operate only in those situations where a debtor had a continuing legal obligation to pay the retiree benefits. In so ruling, the court makes specific reference to the legislative history:

> In this case, the termination of the Wage Agreement, and thus the Mining Companies' obligation to pay, is *not unilateral action by the Debtors but a pre-existing contractual provision.* Congress did not intend for the Retiree Protection Act to reach this type of action. Senator Byrd, a co-sponsor of the Retiree Protection Act, stated that
>
>> [w]hile thousands of retirees could lose their medical and life insurance benefits as a result of their employer's actions under chapter 11 bankruptcy filing, these companies have a *legal* and *contractual* obligation to their retirees.... This legislation will not guarantee continuation of these benefits, but it will provide a mechanism

that will allow the retirees' position to be heard.

. . . .

(Emphasis added.)

*Id.* at pages 404–405.

After noting this history, the court concludes:

According to the provisions of the Wage Agreement, the employer is responsible for maintaining retiree health benefit plans which "shall be guaranteed *during the term of this Agreement*," which expired on January 31, 1988.

*Id.* at page 405.

This Court agrees with the holding in *Chateaugay* and feels its reasoning is applicable to the resolution of this case. Present Bankruptcy Code § 1114 is section 2 of the Retiree Benefits Bankruptcy Protection Act and is based on the same legislative history supporting section 3 as that interpreted in *Chateaugay*. There is further reason to adhere to this view.

### Section 1113

Section 1113 of the Bankruptcy Code deals with rejection of collective bargaining agreements. This section was added to the Code effective July 10, 1984. Congress added the section in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482, 9 C.B.C.2d 1219 (1984), holding that collective bargaining agreements can be rejected under § 365(c) of the Code.

Code § 1113 established a negotiating procedure to be completed before the court considers an application by the debtor to modify the terms of the collective bargaining agreement. Before filing an application to reject a collective bargaining agreement, the debtor must make a proposal to the employee's representative which provides for modification of employee benefits that are necessary for debtor's reorganization. The proposal must assure that all creditors, debtor and all affected parties are treated fairly and equitably. The proposal must be based upon the most complete and reliable information available at the time. The debtor must share information with the employee's representative and must meet, at reasonable times, with the representative to confer in good faith in attempting to reach a mutually satisfactory modification of the agreement. These requirements are set out in § 1113(b).

There can be no doubt that § 1113(b), in coordination with § 1113(c), addresses modification of a debtor's legal obligations for employee benefits owing under a collective bargaining agreement.

### Section 1114

Section 1114 is modeled after § 1113. The same standard for modification of a collective bargaining agreement under § 1113 is adopted in § 1114. The standards are set out in §§ 1113(b)(1) and 1114(f)(1), respectively. Except for a few grammatical changes and the substitution of the word "retiree" for the word "employee," these statutes are identical.

There is no language in § 1114 to indicate that Congress expected it to operate on nonallowable claims—claims for which the debtor has no contractual or other legal liability. If Congress had intended § 1114 to create some new right in the retirees upon debtor's entry into Chapter 11, it is improbable that Congress would have adopted the same standard for § 1114 as prescribed for modification of agreements under § 1113. The better inference is that Congress intended to focus primarily on the modification of debtor's legal obligations to retirees as opposed to creating for the debtor some new obligation not already imposed by the terms of the retiree benefit plan.

### Expenses of Committee

At the hearing in this case, the Court deferred the salaried retirees' invitation to appoint an Official Salaried Retirees' Committee under § 1114. This was done, in part, for economic reasons. If the salaried retirees have no rights to future benefits under the plan, and if the debtor has no duty to pay those benefits to the salaried retirees, there is nothing to negotiate in this elaborate procedure set up in both

§ 1113 and § 1114. If there is no duty to the salaried retirees because ERISA law recognizes none, why should the Court appoint a committee to negotiate? The committee would hire attorneys and incur unnecessary expense for the Estate.

In another case, however, if the Court is persuaded that there is some need to be fulfilled by an official § 1114 committee, even where, as is the case here, there is no duty on the debtor to pay future plan benefits, the Court believes it could appoint a committee under § 1114(c)(2) which authorizes such appointment with the language: "or if the court otherwise determines that it is appropriate."

The Court sustains the Motion of Wilson Foods Corporation To Determine That Modification Procedures Under Section 1114 of the Bankruptcy Code Do Not Apply to Certain Adjustments of Salaried Retiree Benefits for the reasons stated.

## APPENDIX

TRANSMITTAL LETTER DATED DECEMBER 28, 1990, WHICH WILSON FOODS CORPORATION SENT TO ITS SALARIED RETIREES

December 28, 1990

Dear Retiree:

Wilson Foods Corporation ("Wilson") is undergoing a financial reorganization under Chapter 11 of the United States Code. Wilson has filed the enclosed Notice of Motion with the U.S. Bankruptcy Court in Topeka, Kansas. Generally speaking, a motion is a request that a court grant a party certain requested relief.

The enclosed Motion could result in adjustments to your medical plan. Wilson believes the adjustments are necessary to permit Wilson's financial reorganization. The adjustments affect your medical plan only. Basically, unless you receive a further notice, benefits will remain the same with the exception of indexing certain plan provisions (deductibles and out-of-pocket maximums), which will increase based upon the consumer price index used by Medicare.

The medical plan adjustments also include the following limitations:

1. Benefit payments are limited to Medicare approved amount.
2. Plan benefits (except for prescription drugs) are limited to those covered by Medicare.

Pending further notice, prescriptions drugs will continue to be covered under the medical plan and your vision and hearing coverage does not change.

If you have questions about these adjustments, please call Alice Guillott at (405)525–4952 on or after January 2, 1991.

Sincerely,
WILSON FOODS CORPORATION
William L. Brady
Vice President & Controller

Selected Parts of SUMMARY
PLAN DESCRIPTION

COVERAGE TERMINATION/SURVIVING SPOUSE, p. 31

Under current Company policy, you are covered until your death. In the event you die before your eligible spouse dies, benefits may continue for your surviving spouse.

---

Wilson Foods Corporation provides the benefits described in this handbook to eligible employees who have retired from the service of the company before July 1, 1989. The benefits are provided at no cost to you. Generally, all benefit coverage ceases on the last day of the month in which you die. However, if you retired on or after July 1, 1979, coverage for your surviving eligible spouse will continue after your death.

If you retired prior to July 1, 1979, your surviving spouse, if applicable, may be eligible to continue coverage for up to three years by paying for it. See page 32 for information about the provisions for continuing coverage at your spouse's expense.

*Wilson Foods Corporation reserves the right to amend, modify or terminate the plans described in this handbook at any time subject only to the limitation*

*that no amendment, modification or termination shall serve to limit, reduce or otherwise adversely affect any claim for covered services or supplies already incurred, provided you, or your spouse, were entitled to benefits under the plan immediately prior to the date of the amendment, modification or termination.*

Wilson Foods Corporation will be responsible for the administration and interpretation of the plans described in this handbook.

[Emphasis added.]

CONTINUATION OF COVERAGE, p. 32–33

If your eligible spouse's company-paid coverage should terminate because of your death or divorce, he/she may be able to continue it by making group rate contributions.

. . . .

If you choose continuation coverage, the company will provide coverage which, as of the time coverage is being provided, is identical to the coverage provided under the plan to similarly situated employees or family members. You will be afforded the opportunity to maintain continuation coverage for up to three years. However, continuation coverage may be cut short for any of the following five reasons:

1. *The company no longer provides group health coverage to any of its salaried retirees and their spouses;*

. . . .

[Emphasis added.]

LOSING HEALTH CARE BENEFITS, p. 35

Under some circumstances, for instance, if you do not claim benefits *or if the plans end,* you can lose health care benefits.

Most of the circumstances under which you might not receive health care benefits have been described in other parts of this booklet. However, just to summarize:

● The responsibility for claiming benefits lies with you. If you do not file a claim or provide the information needed to process it or if you misrepresent or falsify a claim, you may lose benefits.

● If you retired before July 1, 1979 and subsequently die, coverage for your spouse, if applicable, will terminate immediately unless your spouse exercises the right for Continuation Coverage. In any event, coverage could be continued no longer that three years from the date of your death.

● *Although Wilson Foods plans to continue this health care coverage indefinitely, the company reserves the right to change or end it. In this case, your coverage could be altered or ended altogether.*

[Emphasis added.]

HOW YOU CAN LOSE BENEFITS, p. 39

Under some circumstances—for instance, if your beneficiary designation is not current—your beneficiary could lose benefits.

You should be aware that there are some circumstances in which you or your beneficiary may lose benefits:

● If you do not keep your beneficiary designation up-to-date and your beneficiary dies or cannot be located at your death, your beneficiary will not receive the benefits due. In this case, your life insurance will be paid to your estate.

● *If this group plan ends and is not replaced by another plan, your coverage will end. The company expects this plan to continue indefinitely. However, the company reserves the right to change or end the plan and its coverages at any time.*

[Emphasis added.]

MEDICARE PART B REIMBURSEMENT, p. 40

. . . .

Reimbursement for the Medicare premium is made on each September 1st following your retirement. You will be reimbursed for each full month that you (and/or your spouse) have been age 65 prior to September 1 payment date. You and your eligible spouse will continue to be reimbursed once a year on or about September 1. *As with other health coverages, this reimbursement program may be changed or terminated by the company at any time.*
[Emphasis added.]

ADMINISTERING THE BENEFIT PROGRAM, p. 41
Our Plans are administered by the Director of Human Resources

---

*Wilson Foods Corporation reserves the right to amend, modify or terminate the Plans described in this publication at any time subject only to the limitation that no amendment, modification or termination shall serve to limit, reduce or otherwise adversely affect any claim existing at the time, provided you, or your spouse, were entitled to benefits under the Plan immediately prior to the date of the amendment, modification or termination.*