**In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc. and Bar Harbor Airways, Inc. d/b/a Eastern Express, Debtors.**

Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10449 (BRL) and 91 B 10287 (BRL).

United States Bankruptcy Court, S.D. New York.

Nov. 21, 1991.

As Amended Nov. 26, 1991.

See also 134 B.R. 528.

Weil, Gotshal & Manges, New York City, for trustee (Deryck A. Palmer and Matthew A. Cantor, of counsel).

O'Melveny & Myers, New York City, for creditors committee (Adam C. Harris and Wendy Y. Hill, of counsel).

Bisbee, Rickertson & Herzog, Atlanta, Ga., Sp. Counsel (Donald L. Rickertsen and Robert Williamson, of counsel) and William G. Bell, Miami, Fla., for retiree committee.

## MEMORANDUM DECISION ON RETIREE COMMITTEE'S MOTION AND TRUSTEE'S CROSS MOTION FOR DECLARATORY RELIEF REGARDING PRIORITY OF RETIREE CLAIMS

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

Before the Court is a motion brought by the Official Retiree Committee ("Retiree Committee") appointed pursuant to 11 U.S.C. § 1114(b)(2) seeking a declaration that 11 U.S.C. § 1114 gives retiree claims a broad all encompassing administrative claim status, and a cross motion in opposition by Martin R. Shugrue, Chapter 11 Trustee ("Trustee") for Eastern Airlines ("Eastern" or "Debtor"), joined by the Official Creditors' Committee with separate

pleadings seeking to limit the administrative status of those claims.

Eastern, a major public air carrier operating under the aegis of its Chapter 11 Trustee, ceased revenue flying on January 19, 1991 and began an orderly liquidation program which remains ongoing. There is no possibility of rehabilitation. At the time the Trustee shut down the airline, there were approximately 10,000 retirees under age sixty-five receiving benefits from Eastern at a level of approximately $3.6 million per month. The benefits continued at that level until modified in May of this year pursuant to the procedures called for under § 1114, a relatively recent addition to Chapter 11 of the Bankruptcy Code ("Code").

This provision, enacted with 11 U.S.C. § 1129(a)(13), has spawned diverse and sometimes inconsistent interpretations and theories as to the substantive and procedural standards necessary for modification of retiree benefits.[1] Expressed colloquially, these interpretations are all over the lot. Some are well reasoned, some conclusory with limited analysis.

---

1. *See In re Chateaugay Corp.*, 945 F.2d 1205 (2nd Cir. (N.Y.) 1991) (Retiree Benefits Protection Act does not require a chapter 11 debtor to continue to pay health benefits to retirees after expiration of the wage agreement that provided for the payment of those benefits); *In re Doskocil Companies, Inc.*, 130 B.R. 870 (Bankr.D.Kan. 1991) (Chapter 11 debtor has no legal obligation to continue health care and life insurance benefits under plan whose description unambiguously allowed amendment, modification, or termination of benefits); *In re Garfinckels*, 124 B.R. 3, 4 (Bankr.D.C.1991) (Section 1114 is applicable to liquidating chapter 11 case despite the fact that it "simply was not written with a liquidating Chapter 11 plan in mind"); *In re Jones & Lamson Mach. Co., Inc.*, 75 B.R. 208 (Bankr. D.Conn.1987) and *In re Jones & Lamson Mach. Co., Inc.*, 102 B.R. 12 (Bankr.D.Conn.1989) (Debtor could not avoid secured creditor's liens to pay benefits to retirees; law requires only that chapter 11 debtor pay retiree benefits to retirees if there is unencumbered property from which payments may be made); *In re GF Corp.*, 115 B.R. 579 (Bankr.N.D.Ohio 1990) *vacated, in part, on reconsideration by In re GF Corp.*, 120 B.R. 421 (Bankr.N.D.Ohio 1990) (Court may not require lenders to lend money in violation of lending agreement in order to support payment of retiree benefits); *In re Ohio Corrugating Co.*, 115 B.R. 572, 575 (Bankr.N.D.Ohio 1990) *rev'd on other grounds, United Steelworkers of America v. Ohio Corrugating Co.*, No. 4:90CV0810,

1991 WL 213850 (N.D.Ohio Mar. 18, 1991) ("Since the *Unimet* decision was rendered, Congress enacted 11 U.S.C. § 1114 as part of the Retiree Benefits Protection Act of 1988. This section deals specifically with retiree benefits and would appear to make the applicability of § 1113 to those benefits a moot issue."); *In the Matter of Federated Dep't. Stores, Inc.*, 132 B.R. 572 (Bankr.S.D.Ohio 1991) (Interplay of newly enacted § 1114 and 1129(a)(13) only envisions that *some* benefit at *some* level will continue during the confirmation process); *In re St. Louis Globe Democrat, Inc.* 86 B.R. 606 (Bankr. E.D.Mo.1988) (Notwithstanding the modification provisions of § 1114, retiree claims continue to enjoy administrative status unless the collective bargaining agreement is modified or rejected under § 1113; Leslie T. Gladstone, *Retiree Benefits Bankruptcy Protection Act of 1988: Welfare Benefits in Need of Reform*, 65 AM. BANKR.L.J. 427, 451, ("Section 1114 also improperly continues the age old misconception that retiree benefits fall within the executory contract law doctrine.") (Spring 1991), Martin J. Bienstock, *Bankruptcy Reorganization* at 151 (Supp.1989) ("While section 1114 had the unfortunate effect of elevating retiree claims for benefits coming due during the chapter 11 case above most other priority claims, it does show that they are not to be considered executory contracts under Bankruptcy Code section 1113, and it does not provide union retiree claims priority over nonunion retiree claims.")

Earlier in this case, the Trustee commenced negotiations for modification of retiree benefits with the Retiree Committee which had been appointed on April 2, 1991 to represent (1) Retirees under collective bargaining agreements with the Air Line Pilots Association, International ("ALPA"); and (2) "Non–Contract" retirees, made up of non-union management and clerical retirees. Retirees represented by the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") and retirees represented by the Transport Workers Union of America, AFL–CIO, Local 553 ("TWU") were and continue to be represented by their respective unions ("IAM", "TWU" or "Unions").[2] The negotiations among the Trustee, Retiree Committee and the Unions continued pending a May 22, 1991 hearing scheduled to consider the Trustee's motion for relief under § 1114(g) or for an interim relief ruling under § 1114(h). On the day of the hearing, the Retiree Committee and the Trustee reached an interim agreement covering the period from July 1, 1991 through December 31, 1991 (the "Interim Agreement"). The IAM, TWU and the Trustee were unable to come to an agreement. Consequently, the Trustee proceeded with the § 1114(h) motion for interim relief and, at the conclusion of the hearing, was authorized to impose interim modifications on the union retirees. Such modifications were substantially identical to those agreed to by the Retiree Committee.

At the hearing, the parties agreed that they were at an impasse as to permanent modification of benefits because too many outstanding legal issues were not well settled. Many of these issues have been addressed, although somewhat inconsistently, in the aforementioned cases. *See supra* note 1. By stipulation, a hearing to consider permanent modification was scheduled for December 16, 1991 with the instant motion contemplated in the event no further accord was reached.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). While the summary judgment format that the parties have employed to bring these issues before the court during this gap period between the § 1114(h) interim relief hearing and the scheduled § 1114(g) hearing is inappropriate, it is important that the Court address some of the arguments raised to facilitate resolution of this controversy. In other words, this dispute is ripe for determination by declaratory judgment. *See* 28 U.S.C. §§ 2201–2202 and *Federated Department Stores, Inc.*, 132 B.R. 572 (Bankr.S.D.Ohio 1991).

## POSITION OF THE PARTIES

### A. Retiree Committee.

Asserting a plethora of theories in support of an overarching administrative claim for unaccrued future benefits as well as those due to modification, the Retiree Committee has asked this Court to find that retiree benefits enjoy a super priority such that: (1) regardless of whether Eastern liquidates in Chapter 11 or Chapter 7, the priority afforded to retiree benefits by § 1114 protects all Eastern retiree benefits to the extent unencumbered funds are available; (2) by virtue of unrejected collective bargaining agreements, Eastern pilot retirees have unalterable priority rights under Bankruptcy Code § 1113; and (3) postpetition retiree claims are entitled to priority as administrative expenses of Eastern's Chapter 11 estate under § 503(b)(1).[3]

### B. Trustee.

The Trustee has asked this court to find that: (1) Retiree Benefits Lost due to modification under § 1114 are prepetition general unsecured claims; (2) the retiree's claims for benefits will be prepetition general unsecured claims in the event Eastern's case is converted from a case under Chap-

**2.** The IAM and TWU have not participated in the instant motions.

**3.** Post-petition retiree claims under § 503(b)(1) will not be addressed in this decision as they are individual employee fact specific claims subject to possible exit or other agreements the circumstances of which have not been made part of the record presented in these motions.

ter 11 to a case under Chapter 7; (3) § 1114 is the exclusive means by which the Trustee must pay and modify benefits; and (4) independent of § 1114, the retirees' claims for benefits are prepetition general unsecured claims.

## C. Creditors' Committee.

In addition to joining the Trustee's arguments, the Creditors' Committee has asked this court to find that: (1) pursuant to the terms of the agreements granting benefits, Eastern has the right to terminate retiree benefits without giving rise to any claims whatsoever;[4] and (2) § 1114 is inapplicable in a liquidating case.

### PROCEDURE FOR MODIFICATION OR TERMINATION OF BENEFITS

### THE RELATIONSHIP BETWEEN §§ 1113 AND 1114

■ The parties dispute whether § 1114 is the exclusive provision of Chapter 11 governing modification of retiree benefits. There is no statutory provision answering this question, and there is no legislative history that provides an unequivocal answer:

> In addressing the modification of retiree benefits arising under a collective bargaining agreement, the Committee makes no judgment as to whether trustees may seek modification of such retiree benefits under Section 1114 without first complying with the provisions of Section 1113 of the Bankruptcy Code.

S.Rep. No. 119, 100th Cong., 1st Sess. pt. 1 at 4, *reprinted in* 1988 U.S.Code Cong. & Admin.News 683, 685.

Thus, without any clear indication from Congress, the courts are left to resolve this issue through principles of statutory construction. It is well settled that "where there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987), quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976), quoting *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974) (emphasis in original). Application of this principle here leads to the conclusion that § 1114 is the exclusive provision relating to the modification or termination of retiree benefits. § 1114 specifically and unequivocally addresses retiree issues that are otherwise generally covered by § 1113.

Upon close analysis of the § 1114 process, it becomes clear that it would be a waste of resources and a needlessly complicated process to require compliance with both § 1113[5] and § 1114. Recognizing possible conflicts arising from a union's simultaneous representation of current employees and retirees, § 1114 provides an explicit statutory scheme to insure that retirees are adequately represented, and provides that a committee of retired persons will be appointed to represent the interests of union retirees whose labor organization has elected not to represent the retiree's interests. *See* § 1114(c)(2) ("where the labor organization ... elects not to serve as the authorized representative ... the court ... shall appoint a committee of retired

---

**4.** The Creditors' Committee has argued that under the recent *In re Doskocil Companies Inc.*, 130 B.R. 870 (Bankr.D.Kan.1991) and *In re Chateaugay Corp.*, 945 F.2d 1205 (2d Cir.1991) decisions the Trustee is free to terminate retiree benefits as this right was preserved in various summary plan descriptions. These cases held that section 1114 does not protect retiree benefits beyond the contractual obligations of the debtor. Consequently, the Creditors' Committee argues that Eastern is free to terminate retiree benefits at any time. Such termination of benefits would be absolute; no claim whatsoever would arise against the estate. The Trustee, however, has not requested such a termination

of benefits and, therefore, this court offers no opinion on the parties' rights in this respect. It appears that the Trustee's sole intent is to establish that the benefit claims accruing after December 31, 1991 are general unsecured claims rather than *administrative expense claims*; he has shown no inclination to attempt to completely extinguish these claims.

**5.** These complications are further exacerbated by the continuing litigation over the effect of the expiration of the ALPA collective bargaining agreement and the operative residual effect of the Railway Labor Act on that agreement.

employees ... to serve as the authorized representative of such persons under this section.")

At this point, the Retiree Committee is the only representative authorized to negotiate with the Trustee for the modification or termination of retiree benefits under any section of the Bankruptcy Code. ALPA, the union bargaining unit, cannot negotiate retiree benefits after electing not to represent the pilot retirees under § 1114. Once ALPA opted out of retiree representation, its ability to do so was extinguished. Applying a § 1113 collective bargaining agreement rejection process would restore the potentially conflicted ALPA back into the negotiation process. This is antithetical to the statutory scheme which clearly contemplates that the Trustee will negotiate retiree modification issues with the authorized representative of the union retirees solely within the confines of § 1114.

Support for the foregoing can be found in *In re Ohio Corrugating Co.*, 115 B.R. 572 (Bankr.N.D.Ohio 1990), *rev'd on other grounds, United Steelworkers of America v. Ohio Corrugating Co.*, No. 4:90CV0810, 1991 WL 213850 (N.D.Ohio Mar. 18, 1991) which held that § 1114 does indeed displace § 1113. In *Ohio Corrugating*, the bankruptcy court discussed the applicability of the decision in *In re Unimet Corp.*, 842 F.2d 879 (6th Cir.1988), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988), to the case before it, noting that a primary issue in *Unimet* was whether § 1113 applied to retiree benefits. The court stated:

> Since the *Unimet* decision was rendered, Congress enacted 11 U.S.C. § 1114 as part of the Retiree Benefits Bankruptcy Protection Act of 1988. This section deals specifically with retiree benefits and would appear to make the applicability of § 1113 to those benefits a moot issue.

*Id.* at 575, n. 2.

Finally, it is clear that compliance with the substantive and procedural requirements for modification of retiree benefits under § 1114 also satisfies the substantive and procedural requirements for rejection of collective bargaining agreements under § 1113. When Congress enacted § 1114, it used the same procedures and standards as existed for modification or rejection of collective bargaining agreements under § 1113. *Compare* 11 U.S.C. §§ 1113(b) and (c) *with* 11 U.S.C. §§ 1114(e) and (g), respectively. As the Senate Report accompanying this legislation makes clear:

> These standards are intended to be identical to those contained in Section 1113. In adopting this standard the Committee believes that it is important to use a standard with which the courts are already familiar. The Committee believes that the Section 1113 standards strike a fair and reasonable balance between the need to protect the rights of retirees and the rights of other creditors.

S.Rep. No. 119 at 6, *reprinted in* 1988 U.S.Code Cong. and Admin.News at 687–688. Therefore, compliance with § 1114 is substantively and procedurally the same as compliance with § 1113. The only difference is the potential retiree negotiator. *See* 11 U.S.C. § 1114(c). Thus, § 1113 is not implicated as a predicate for retiree benefit modification relief.

### NON–APPLICABILITY OF § 1114 IN CHAPTER 7

█ The Trustee's motion requests a determination that upon expiration of the stipulation of the parties that modified benefits through December 31, 1991, the retiree claims for benefits will be prepetition general unsecured claims in the event Eastern's case is converted from a case under Chapter 11 to a case under Chapter 7. The Trustee has not disputed that without any further modification or conversion to Chapter 7, such claims will be administrative expense claims. The Trustee has made clear that with respect to retiree issues he intends to either modify or terminate the benefits under Chapter 11 or propose conversion of the case to Chapter 7.

In response, the Retiree Committee argues that conversion to Chapter 7 would not affect the status of the retiree claims. The Retiree Committee takes the position that the language of 11 U.S.C. § 1114(e)—

"Notwithstanding any other provision of this *title*" (emphasis added)—means that this provision applies over all other provisions of the Code. Alternatively, it argues that the filing of a Chapter 11 petition triggers § 1114; the provision then continues to establish a priority even if the case is later converted to Chapter 7. The Retiree Committee argues that this is so whether or not § 1114 would apply to a case that was originally filed under Chapter 7. This would be tantamount to the creation of a new elevated form of superpriority which, for want of a better label, I would call an adhesion priority. If Congress' intent was to make § 1114 priorities applicable in non-Chapter 11 cases, it would have placed coordinating amendment(s) in either Chapter 1, 3, or 5. *See* 11 U.S.C. § 103(a). Chapter 11 provisions do not apply in Chapter 7. *See* 11 U.S.C. § 103(f). No court has held that § 1114 is applicable to a Chapter 7 case regardless of the circumstances. Therefore, only while a debtor is in Chapter 11 are those § 1114 mandated benefit payments administrative expenses. *See* 11 U.S.C. § 1114(e). Once a Chapter 11 case is converted to a case under Chapter 7, retiree benefits are no longer mandated and can only be considered under the well established distributive scheme of the non-Chapter 11 chapters.

Accordingly, the conclusion is inescapable that § 1114 is not applicable in Chapter 7.

### APPLICABILITY OF § 1114 IN CHAPTER 11 LIQUIDATING CASES

#### A. Introduction.

Because § 1114 is a relatively new statute reacting to recently heightened social concerns, this Court is faced with a situation which bankruptcy courts have only just begun to encounter and none have facilely resolved in the reported cases— that of deciding how § 1114 applies to a debtor that is effectively in liquidation, although it remains in Chapter 11. A review of the legislative history in the following sections reveals no indication that Congress ever contemplated that § 1114 would apply in a liquidating case. Nevertheless, it is an unrestrained provision in Chapter 11 and cannot be ignored.

The Retiree Benefits Protection Act of 1988 (Retiree Benefits Act), Pub.L. No. 100–334, brought two additions to the Bankruptcy Code, § 1114 and § 1129(a)(13). Section 1114 provides the standards that must be followed before retiree benefits may be modified. Section 1129(a)(13) establishes that as a condition to confirmation, the plan must provide retiree benefits at the level established under § 1114 for the duration the debtor has obligated itself.

It is well known that the Retiree Benefits Act was enacted by Congress in response to the mammoth steel manufacturing LTV Corporation's short lived unilateral termination of the health and life insurance benefits of its retirees upon the filing of its Chapter 11 petition. Almost immediately after the termination, this Court provisionally ordered restoration of the payments. *See In re Chateaugay Corp.*, 64 B.R. 990 (S.D.N.Y.1986). Nevertheless, in response to LTV's actions, Congress enacted broad legislation to address the issue of a reorganizing debtor's obligation to continue paying retiree benefits during the pendency of the Chapter 11 reorganization.[6] *See In re GF Corp.*, 115 B.R. 579, 583 (Bankr.N.D.Ohio 1990). Unfortunately, as is obvious from the legislative history, in enacting § 1114, Congress reacted with expressed concern for the plight of retirees on the facts presented in LTV, and failed to specifically address issues relating to retiree benefits in other circumstances which arise, not atypically, in cases pending under Chapter 11 (*i.e.*, liquidations or cases where there are no unencumbered assets available to pay retiree benefits, etc.). *See In re GF Corp.*, 115 B.R. at 583, *In re Jones &*

---

**6.** Following the provisional restoration ordered by this Court, Congress enacted special temporary legislation that required LTV to reinstate its retiree benefit payments. *See* S.Rep. No. 119, 100th Cong., 1st Sess. 2, *reprinted in* 1988 U.S.Cong. & Admin.News 683, 684, and discussion of prior interim "LTV" legislation therein.

*Lamson,* 102 B.R. at 16. Some indicators of Congress' intent and awareness as to the applicability of § 1114 in those circumstances, however, can be gleaned from the statutory language and the legislative history and policy arguments initially supporting the statute's enactment.

### B. The Statute.

#### 1. Necessity of a Reorganization.

A consistent premise underlying § 1114 is that a reorganization is in progress. *See* § 1114(f)(1)(A) (modifications proposed by the debtor must be "necessary to permit the reorganization of the debtor") and § 1114(g)(3) (such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities). This "necessary to permit the reorganization of the debtor" criterion is "robbed of its meaning" when the debtor is engaged in a liquidation. *In re GF Corp.,* 115 B.R. at 585.

Other portions of § 1114 that do not specifically use this phrase are only useful when a reorganization is in progress. For example, § 1114(g)(3) provides that at any time after an order is entered providing for modification of retiree benefits, or an agreement modifying benefits is made between the trustee and the authorized representative of the retirees, the authorized representative may "apply to the court for an order increasing those benefits which order shall be granted if the increase in retiree benefits sought is consistent with the standard set forth in paragraph (3)," *i.e.,* "necessary to permit the reorganization of the debtor." 11 U.S.C. § 1114(g)(3). This language plainly suggests that Congress was aware that as the rehabilitative effort progressed, the debtor might have greater capability to pay retiree benefits, and that a full or partial "snap back" of those benefits might be appropriate.[7] Such "snap back" considerations clearly have no

place in a typical liquidation scenario where no improvement of a debtor's fortunes is foreseeable.

As a further example, subsection 1114(k)(3) provides that the court may enter such protective orders as may be necessary to prevent disclosure of information to the retirees' authorized representative where such disclosure "could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged." This provision clearly illustrates Congress' salient concern that § 1114 preserve and encourage, rather than impede, the rehabilitative effort of an *ongoing business enterprise,* while concurrently protecting retirees. Where there is no operating entity, there can be no concerns about industry competition.

In sum, it is evident from the statute itself that Congress glossed over the fact that while Chapter 11 cases are usually nonliquidating rehabilitative reorganizations, this is not always, or necessarily, the case. *See* 11 U.S.C. § 1123(b)(4) (liquidation of all or substantially all of the property of the estate). Where a moribund debtor, like Eastern, is liquidating under Chapter 11, "necessary to permit the reorganization of the debtor", construed literally, does not provide a meaningful standard for this Court to apply.

### C. Legislative History.

Like the statute itself, the legislative history of § 1114 reveals no congressional intent that this section apply to liquidating debtors, in Chapter 7 or 11. In support of this legislation, Senator Metzenbaum stated that the enactment of § 1114 would make it clear that "reorganizing companies may never unilaterally cut off retiree insurance benefits," because "the burden of turning a company around should not rest on the backs of retirees." 134 CONG.REC. S6823, S6825 (daily ed. May 26, 1988) (statement of Sen. Metzenbaum). He further noted that § 1114 was enacted to pro-

---

**7.** *See generally Wheeling–Pittsburgh Steel v. United Steelworks,* 791 F.2d 1074, 1090–91 (3d Cir.1986) (In the context of Bankruptcy Code § 1113, the Third Circuit held that proposed

modification of collective bargaining agreement which did not include a "snap back" provision was not "necessary to permit the reorganization of the debtor" under § 1113(b)(1)).

vide "protections as a company reorganizes and comes out of bankruptcy." *Id.* at S6825. Obviously, these comments by the ·principle sponsor of the bill suggest that Congress did not contemplate that this legislation would impact debtors who were not in the process of reorganizing (i.e. not turning around).

The comments of Representative Fish confirm this observation:

> The amendment in the nature of a substitute limits relief to retirees in reorganization cases in spite of the fact that retirees in liquidation cases have the same need for protection. Our failure to protect retirees in liquidation cases creates a danger of giving other creditors an incentive to defeat reorganization. We are giving other creditors a reason for finding Chapter 7—liquidation—more favorable to their interests.

134 Cong.Rec. H8558 (daily ed. October 13, 1987) (statement of Rep. Fish). Congress' debate seems to have been based on the faulty premise that Chapter 11 is reserved for restoring entities to productive viability just as Chapter 7 is reserved for liquidating entities.

### D. Policy Considerations.

In most reorganizations, the debtor in possession is confronted with the question of how to cut costs and increase profitability in furtherance of a successful rehabilitative reorganization effort. Congress drafted § 1114 to insure that debtors did not seek to effect reorganizations "on the back of retirees" for the benefit of other parties in interest. Section 1114 provides a status quo safeguard to retirees during the plan negotiation process. It requires a debtor to pay in a timely fashion and refrain from modifying any retiree benefits until a determination is made as to what modifications are "necessary to permit the reorganization of the debtor." 11 U.S.C. §§ 1114(e)(1) and (g). This assumes that bargaining will facilitate that process that encourages the emergence of a viable entity from bankruptcy court. Conversely, in the Eastern case, the current lack of viability precludes any available income stream

from which to pay retiree benefits or to swell a finite asset pool.

Since there are no material differences between the mechanics of liquidation in Chapter 11 or Chapter 7, Congress could not have intended the results of such liquidations to differ so markedly by enhancing the claim of retirees in one instance (a Chapter 11 liquidation) but not the other (a Chapter 7 liquidation). Accordingly, where the debtor is completely liquidating its assets in Chapter 11 in contemplation of a final distribution to creditors, that debtor should not be compelled to continue paying retiree benefits, in full, on a priority basis.

Applying § 1114 as requested by the Retiree Committee to liquidating Chapter 11 cases involving a large work force, in most instances, can result in the depletion of all, or substantially all of an estate's assets. In many cases, there would be insufficient funds even to pay administration creditors to complete the liquidation, and little or no funds for distribution to other general unsecured creditors. Such a result would be in violation of the overall objectives of the Bankruptcy Code to pursue the greatest benefit for all creditors of the estate and to promote a fair and equitable distribution. *See In re GF Corp.*, 115 B.R. at 585.

The Retiree Committee relies on *In re Garfinckels*, 124 B.R. 3, 4 (Bankr. D.C.1991), which held that "[t]he obvious congressional inattentiveness to liquidating Chapter 11 cases does not make § 1114 inapplicable to such cases." In *Garfinckels*, there were no unencumbered assets to pay retiree benefits. Consequently, "no harm" would befall the estate if § 1114 were held to be applicable. *Id.* at 5. The court simply held that § 1114 was applicable to a liquidating case. It was not necessary for the court to explore *how § 1114(g) would be interpreted in such a case.* In fact, the Creditor Committee's brief (p. 33) notes that by order dated April 24, 1991, the *Garfinckels* court granted relief under § 1114 allowing the termination of retiree benefits. It is unclear, however, how the court interpreted § 1114 to grant such relief.

In one of the few cases brought to the Court's attention that addresses the type of § 1114 relief that the Trustee seeks, *In re GF Corp.*, the court was initially confronted with a demand by the retirees to order the Debtor to make benefit payments despite the fact that the debtor had no unencumbered assets with which to do so. The retirees did not provide any suggestions as to how the Debtor could continue the payments. Consequently, the court examined the Code to determine what remedies are available when a debtor fails to comply with the extremely broad language of § 1114. While noting that § 1114 applies to all Chapter 11 cases, liquidating or not, Judge Bodoh reviewed the parties' options:

> "The usual remedies where a debtor-in-possession fails to comply with the Bankruptcy Code are conversion to a Chapter 7 case, dismissal of a case, or the appointment of a trustee or examiner. 11 U.S.C. §§ 1104, 1112. None of these remedies advances the cause of the retirees ... Conversion would eliminate the section 1114 issue, as that section does not apply in Chapter 7 ... In liquidation, the retirees would be in a position worse than they are in now."

Upon review of the unyielding language of § 1114, however, the court felt compelled to hold that retiree benefit payments must be made " 'as soon as there are unencumbered assets available to make such payments,' *GF*, 115 B.R. at 586, although this treatment was clearly incompatible with the statutory procedure for allowing and paying administrative expenses." *In re GF Corp.*, 120 B.R. 421, 424 (N.D.Ohio 1990). While he expressed regret that this holding might force the Debtor into Chapter 7, Judge Bodoh found his conclusions unavoidable.

Subsequently, when confronted with a proposed compromise that would allow the Debtor to complete its liquidation in Chapter 11 by allowing some recovery to unsecured creditors while terminating retiree benefits, the *GF* court was constrained to vacate the prior holding to the extent necessary to accommodate the compromise. The court recognized that the alternative to vacating part of the prior decision and approving the compromise was a virtually certain conversion to Chapter 7, either upon motion of the Creditors' Committee or the Debtor. *Id.* at 424. Consequently, without rejecting any of his prior analysis, Judge Bodoh modified his holding since the prior "Order's attempt to enforce the mandate of § 1114(e)(1) created a super-priority which was a significant departure from the statutory scheme of Chapter 11 and which made the orderly liquidation of the DIP a virtual impossibility." *In re GF Corp.*, 120 B.R. at 425. That court never suggests, however, that the prior ruling was not a proper literal interpretation of the statute. Thus, Judge Bodoh presumably believed some deviation from the apparent requirements of § 1114 was necessary under the circumstances of the liquidating Chapter 11 that he faced.

While the foregoing demonstrates the incompatibility of § 1114 as drafted when applied to a liquidation, absent corrective or clarifying legislation, the statute's placement in Chapter 11 requires its application to liquidating Chapter 11 cases.

## APPLICATION OF § 1114 TO EASTERN'S CASE

In applying § 1114, it is incumbent upon this Court to reach an equitable result by deciphering Congressional design from what is clearly reactive legislation designed to address situations similar to those in the LTV bankruptcy. The Retiree Committee suggests that once a company gives up hope of reorganizing as a viable entity, retiree benefits can no longer be modified. This is so, it argues, because the applicable test for modification—"necessary to permit the reorganization of the debtor"—cannot be met.[8] To interpret the quoted language

---

8. For Congressional comments on the proper interpretation of this language in a *reorganization* context, *see* S.Rep. No. S6825 (daily ed. May 26, 1988). *See also*, comments of Mr. Metzenbaum:

It is intended that the words "necessary for the reorganization of the debtor" in sections 2 and 3 should be interpreted as the Third Circuit interpreted them in *In re Wheeling Pittsburgh Steel Corporation*, (791 F.2d 1074 (3d

in this fashion would imply that as a company is struggling to revitalize and conditions become increasingly bleak, the debtor would be entitled to progressively greater and greater modifications of its retiree benefits. Theoretically, at some point, the only way to salvage the reorganization would be to completely terminate retiree benefits. If the motion to modify or terminate the benefits is not heard before any possibility of reorganization is lost, then according to the Retiree Committee, the trustee would be unable to meet this "necessary to" test and would, thereafter, have forfeited any opportunity to modify retiree benefits in any way. This Court cannot find that Congress intended such an anomalous result.

Under the circumstances of this case, the only meaningful interpretation of *"necessary to permit the reorganization"* that is consistent with fair and equitable treatment of retirees and all other creditors is one that does not encourage the Trustee or the Creditors' Committee to seek to convert the case from Chapter 11 to Chapter 7 solely to preserve the possibility of some recovery for general unsecured creditors. In other words, in this liquidating case, "necessary to permit the reorganization" must be interpreted to mean "necessary to accommodate confirmation of a Chapter 11 plan."

### A. Section 1112(b)—Dismissal or Conversion Based on the Best Interests of Creditors and the Estate.

■ A confirmable liquidation plan would cease to be available if the Trustee or other party in interest were to establish cause to convert this case to Chapter 7 under the broad provisions of § 1112(b). While the right to convert is not absolute,

> the growing amount of super-priority retiree claims ... would constitute grounds to convert. Specifically, these claims cre-

ate a 'continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation ...' 11 U.S.C. § 1112(b)(1). Even if the Unsecured Creditors' Committee were unsuccessful in its attempt to convert, it seems quite likely that the DIP would not be able to propose a confirmable plan and would likely convert the case.

*In re GF Corp.,* 120 B.R. at 424.

The Retiree Committee argues that confirmation of a Chapter 11 plan only becomes unavailable when the estate becomes administratively insolvent. This position is simply wrong. Administrative insolvency is but one of the bases for conversion to Chapter 7 under § 1112(b). In addition to 1112(b)(1), there are a multiplicity of causes that could justify a conversion as being in the best interest of creditors and the estate. If any party establishes cause under 1112(b), the conversion of this case becomes inevitable. The non-applicability of § 1114 in Chapter 7 is a major consideration for parties in interest deliberating a move to convert. Section 1114(g) should not be interpreted to encourage such a conversion.

### B. Section 1129(a)(7)—Best Interest of Creditors' Test.

■ Under § 1129(a)(7)(A)(ii), unless all impaired creditors accept the plan, the liquidation plan must provide creditors with distributions at least equal to the value of distributions that they would receive in Chapter 7. Since, under Chapter 7, the retiree's claim for unaccrued benefits would be a prepetition general unsecured claim, all other creditors would necessarily receive a greater distribution under Chapter 7. Therefore, absent a modification of the benefits which is either accepted by Eastern's creditors or reduces the cost of the benefits to the point at which the value

---

Cir.1986)). There the court held that a proposal to modify a labor contract is "necessary to permit reorganization" when essential to the "goal of preventing the debtor's liquidation." (791 F.2d 1074, at 1089). The interpretation of the "necessary" standard by the Second Circuit in the case of *In re Carey Transportation,* (816 F.2d 82 (2d Cir.1987))

would not afford retirees the full protections intended by this measure. Modifications should be ordered by a court only if necessary to avoid liquidation, and the amount of modifications ordered should be only those necessary to avoid liquidation.
134 Cong.Rec. S 6823–27 (daily ed. May 26, 1988).

of confirming a Chapter 11 plan exceeds the cost of the modified benefits, the Trustee would not be able to propose a confirmable plan of liquidation. In other words, without modification or termination of the benefits, the retirees will receive a maximum recovery in Chapter 11 while the other unsecured creditors will receive their maximum recovery in Chapter 7.

C. Section 1114(h)—Application pending final modification and confirmation (see § 1129(a)(13)).

■ Section 1114(h)(1) provides:

Prior to a court issuing a final order under subsection (g) of this section, if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim modifications in retiree benefits.

Although a potential exists for the continuation of interim modifications throughout the administration in Chapter 11, the standards for the grant of interim and final relief are significantly different. After Eastern began liquidating, the Trustee moved under § 1114(h) and was granted interim relief. The Trustee testified that unless retiree benefits were modified, the estate would be irreparably damaged and the Creditors' Committee would move to convert the case to Chapter 7. He also testified that conversion to Chapter 7 would damage the value of the estate. Indeed, although conversion may have been considered by some parties to be in their best interests, no party disputed that the total value of the estate would be diminished in Chapter 7. *See, Best Interest of Creditors Test* discussion, *supra.* Therefore, this Court found that, *inter alia,* interim relief would avoid irreparable damage to the estate. Circumstances have not changed significantly since the interim relief was granted, but the Trustee now seeks final relief under § 1114(g). A different standard applies; the *"irreparable damage"* standard for modification is displaced by *"necessary to permit the reorganization of the debtor".* It would truly be an anomalous result if this Court were to

find that the Trustee could impose long-term modifications on an interim basis, but could not satisfy the standard for a final modification.

### STATUS OF CLAIMS AFTER MODIFICATION OR TERMINATION

■ The Retiree Committee argues that its claims remain administrative expense claims despite modification or termination under § 1114. This assertion is frivolous. In fact, the legislative history of § 1114 provides a specific example of what happens to retiree's claim for benefits lost through modification:

If the present value of the health insurance benefits of retirees is $100 million at the time the petition is filed and the court orders a modification reducing benefit payments by $25 million, the retirees have an unsecured claim for the full $25 million. If every unsecured claimant receives 50 cents on every dollar, retirees would receive $12.5 million in addition to the continuation of 75 percent of their original health benefit.

S.Rep. No. 119, 100th Cong., 1st Sess. 1, 6 n. 2, *reprinted in* 1988 U.S.Code Cong. & Admin.News 683, 688 n. 2.

Thus, Congress' intent on this issue is unequivocally clear: amounts lost due to modification are unsecured claims.

Moreover, the Retiree Committee's position is simply illogical. If the claim arising from the cost savings achieved through modification of retiree benefits was an administrative expense claim, then a Chapter 11 debtor who obtains "relief" under § 1114 would achieve no relief at all—and could actually be in a worse position. If the post-modification benefits had administrative priority status, the debtor would be obligated to pay retirees' claims arising from the modification (equal to the present value of future benefits the debtor is relieved from paying) in cash, in full on the effective date of the plan. See 11 U.S.C. § 1129(a)(9)(A). Such a result would render modification under § 1114 meaningless.

Thus, the unpaid retiree claims resulting from any modification under § 1114 are general unsecured claims. Indeed, pursuant to this Court's order dated June 10, 1991, the benefits have already been temporarily modified under § 1114(h). The retirees' claim for the benefits lost due to that order is a prepetition general unsecured claim, not an administrative expense of Eastern's Chapter 11 case.

## CONCLUSION

When confronting similar circumstances, Judge Bodoh wrote:

> Like Congress, this Court is aware of the harsh circumstances of the retirees who face the loss of their health insurance coverage. Indeed, this Court witnesses daily the hardships imposed upon all parties by the misfortunes which result in bankruptcy. But short of printing money, there is no way to see that all claims are paid in full. The Bankruptcy Code recognizes this reality and provides a method for dealing with it, and the best that this Court can do is see that all of the provisions of the Code are given effect. See, 11 U.S.C. § 105. In the present case, this means that the Court has made its best effort to enforce § 1114 in accordance with the intent of Congress while still acting within the traditional context of the Bankruptcy Code and pursuing the greatest benefit for all creditors of this estate.

*In re GF Corp.*, 115 B.R. at 585. In bankruptcy court, hardships are shared, not unloaded on particular groups. Without an unequivocal Congressional mandate, this Court cannot agree that the retiree committee is entitled to the overwhelming superpriority they seek. Through remedial legislation, the retirees have received some preferential treatment. In granting additional rights denied other unsecured creditors, Congress did not eschew the principle that retirees could share at least some of the burdens and disappointment that other parties experience in bankruptcy. If there is a Congressional consensus that retirees in liquidating cases should be entitled to greater protections than those discussed here, it is incumbent upon Congress to enact statutes setting forth standards that are in harmony with existing law and policy.

The Retiree Committee has appealed to this court's sense of fairness and equity and asked it to broadly apply § 105, if necessary, to provide a just result. There is no question that these claimants arouse a special sense of compassion. It is also inescapable that through § 1114, Congress has sought to establish a priority for retirees in bankruptcy cases that assures that they will receive a measure of enhanced treatment that is consistent with a bankruptcy court's role as a court of equity. In basic terms, § 1114 attempts to assure that retirees will receive their fair share. However, even in reorganization cases clearly governed by § 1114, it is not contemplated that retiree's will receive payment to the exclusion of all other unsecured creditors. Yet, that is the effect of the Retiree Committee's requests.

THEREFORE, THIS COURT HOLDS THAT:

(A) With respect to the Retiree Committee's motion: (1) to the extent that payments were made to retirees through June 30, 1991 under § 1114(e)(1), they are administrative expense claims; (2) to the extent payments are made through December 31, 1991 by stipulation of the parties and order of the Court, they are administrative expense claims; and (3) the motion is denied in all other respects.

(B) With respect to the Trustee's cross motion (joined by the Creditors' Committee): (1) absent corrective or clarifying legislation, § 1114 applies to liquidating Chapter 11 cases; (2) retiree benefits lost due to modification under § 1114 are prepetition general unsecured claims; (3) retiree claims for benefits that accrue after conversion to Chapter 7 are prepetition general unsecured claims; and (4) the present value of the prepetition retirees' claim for future benefits under (2) and (3) above is a prepetition general unsecured claims.

Submit an order consistent with the foregoing.